Michael G. Goldberg
Mark A. Tamoshunas
PRYOR CASHMAN LLP
7 Times Square
New York, New York 10036-6569
Telephone     212-421-4100
Facsimile     212-326-0806

**ORIGINAL**

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ NOV 30 2009 ★

BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

F. OTTOMANELLI GOURMET FOODS, INC.,

*Plaintiff,*

-against-

DORZAR, INC. D/B/A NEW GREAT
AMERICAN VEAL and GREAT
AMERICAN VEAL, INC.,

*Defendants.*

---

**CV09 - 5215**

**COMPLAINT**

(Jury Trial Demanded)

MAUSKOPF, J

REYES, M.J

Plaintiff F. Ottomanelli Gourmet Foods, Inc. ("Ottomanelli"), by its attorneys, Pryor Cashman LLP, as and for its complaint against defendants Dorzar, Inc. d/b/a New Great American Veal ("Dorzar") and Great American Veal, Inc. ("Great American"; and with Dorzar collectively "Great American" and "Defendants"), respectfully alleges as follows:

## JURISDICTION AND VENUE

1.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1332 in that this dispute is between citizens of different states and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

2.     Venue is proper in this District pursuant to 28 U.S.C. §1391(a) in that a substantial part of the events giving rise to the claims occurred in New York.

## PARTIES

3.      Ottomanelli, a seller of pre-packaged meat products which are sold to supermarket chains and specialty stores, is a New York corporation with offices and a principal place of business located at 61-05 Woodside Avenue, Woodside, New York 11377.

4.      Defendant Dorzar, a producer of meat products and a supplier to Ottomanelli is, upon information and belief, a New Jersey corporation with offices and a principal place of business located at 50 Avenue L, Newark, New Jersey 07105.

5.      Defendant Great American, a producer of meat products and a supplier to Ottomanelli is, upon information and belief, a New Jersey corporation with offices and its principal place of business located at 50 Avenue L, Newark, New Jersey 07105.

## FACTS COMMON
## TO ALL CLAIMS

6.      On or about February 27, 2007, Ottomanelli entered into an Agreement with Defendants (the "Supply Agreement") which obligated Defendants "...to supply Ottomanelli such quantities of the manufactured and/or processed food products... as Ottomanelli may require from time to time for supply to its customers."

7.      Under the Supply Agreement, Great American would charge Ottomanelli for goods under a cost plus formula, where the cost incurred by Great American to acquire the meat or poultry was added to a fixed percentage to cover Great American's expense and profit.  The only variable was the price of the meat  or poultry to be processed and packaged.

8.      Great American would then ship the Products to fill Ottomanelli's orders, and would be paid by Ottomanelli on net 21 day terms pursuant to the Supply Agreement.

2

9.    To ensure that the supply by Defendants would continue unabated, the Supply

Agreement further provided in pertinent part as follows:

> 12.   Term.  Manufacturer shall supply Products to Ottomanelli
> for so long as Ottomanelli remains obligated to sell Products
> (including any derivations thereof) to any of its customers.  Either
> party may immediately terminate this Agreement if the other party
> fails to fulfill its obligations hereunder and such failure continues
> unremedied for twenty (20) consecutive days after receipt of
> written notice of the particular failure.   Lavely agreed to
> Sogevalor's request that he provide consulting services to
> Redheads for one month in exchange for a payment of $15,000.00
> and reimbursement for all out-of-pocket expenses incurred in
> connection with his rendition of the services.

10.    In addition, having developed the lucrative supermarket business, Ottomanelli

wanted to insure that the Defendants would not circumvent the agreement, cut Ottomanelli out,

and sell directly or indirectly through others to Ottomanelli's customers.

11.    Accordingly, the Supply Agreement also contains a non-competition provision

which provides as follows:

> 13.   Non-Competition.    Ottomanelli  seeks  to  differentiate
> itself from the market by offering higher quality manufactured
> and/or processed food products on a consistent basis than are
> offered  by  its  competitors.    Ottomanelli  believes  that  this
> differentiated premium product provides it with a distinct
> advantage in the highly competitive meat industry.  Ottomanelli
> further believes that the recognition by the market of its high
> quality offerings will carryover into other private label products to
> be offered by Ottomanelli, thereby creating a brand that sets
> Ottomanelli apart from its competition.
>
> In recognition of the foregoing, Manufacturer hereby agrees
> that, during the term of this Agreement and for a period of five (5)
> years following the termination or expiration of this Agreement
> (the "Restricted Period"), Manufacturer shall not, directly or
> indirectly, sell to any third party that is or was a customer of
> Ottomanelli during the Restricted Period, or enter into discussions
> to sell to any such customer of Ottomanelli, any Products

3

(including any derivations thereof) that Ottomanelli has at any time during the term of this Agreement purchased from Manufacturer for sale to such customers, or any Products that are substantially similar thereto.

Manufacturer agrees that if it violates this Agreement, damages at law, including, but not limited to, monetary damages, will be an insufficient remedy to Ottomanelli, and that, in addition to any remedies or rights that may be available to Ottomanelli, all of which other remedies or rights shall be deemed to be cumulative, retained by Ottomanelli and not waived by the enforcement of any remedy available hereunder, including, but not limited to, the right to sue for monetary damages, Ottomanelli shall also be entitled, upon application to a court of competent jurisdiction, to obtain injunction relief, including, but not limited to, a temporary restraining order or temporary, preliminary or permanent injunction to enforce this Section 13, without the need for Manufacturer to post any bond. Manufacturer further agrees that the terms and the restrictions set forth in this Section 13 are reasonable and valid, and all defenses to the strict enforcement thereof are hereby waived. If at the time of enforcement a court shall hold that the duration, scope, area or other restrictions stated in this Section 13 are unreasonable, Manufacturer agrees that reasonable maximum duration, scope, area or other restrictions may be substituted by such court for the stated duration, scope, area or other restrictions and upon substitution by such court, this Agreement shall be automatically modified without further action by the parties hereto. (Emphasis added.).

12.    Notwithstanding the obligation to provide first quality products, Defendants, *inter alia,* shipping spoiled product to King Kullen.

13.    By reason of the Defendants' delivery of unmerchantable product, Ottomanelli lost the King Kullen account.

14.    In addition, Defendants repeatedly failed and refused to account to Ottomanelli for rejected product, which was potentially unfit for consumption and was contained in packaging bearing the Ottomanelli name, and to this day Defendants have failed and refused to disclose to

4

Ottomanelli what it did with the rejected product.

15. At a point when Ottomanelli fell behind in making certain payments, Defendants demanded that it be empowered to bill and collect all receivables from Ottomanelli's customers, and apply the proceeds to recoup the indebtedness.

16. Defendants threatened to stop supplying Ottomanelli with Product, in breach of the Supply Agreement, unless Ottomanelli acceded to this demand.

17. To save its business, Ottomanelli relented to this extortionate conduct.

18. Pursuant to the terms of the agreement which was reached (the "Workout Agreement"), an account was specifically opened at Bank of America under the Ottomanelli name, with signing authority for the principals of Great American.

19. Ottomanelli was told that Defendants would use this segregated account for all of the Ottomanelli sales, and that Defendants would keep careful records and make all documents regarding billings and collections available so that Ottomanelli could closely monitor the progress of Defendants' purported effort to recoup past due amounts.

20. Several months passed and despite the repeated assurances to the contrary, Ottomanelli received accountings that were incomplete and which precluded it from monitoring the business.

21. In an attempt to obtain information to ensure that Defendants were not taking advantage of the situation, Ottomanelli hired people to work with Defendants to reconcile accounts and monitor invoices and collections.

22. However, Defendants refused to provide the Ottomanelli representatives with information regarding the costs for which it was being billed under the Supply Agreement.

5

23.     In addition, Defendants did not use the account which had been established by Ottomanelli, and instead deposited all checks from Ottomanelli customers into its own account.

24.     This deliberate commingling of the funds by Defendants made a reconciliation nearly impossible, and served to further obscure Great American's accounting.

25.     Given its knowledge of the business, the profit margins and the volume of product sold, Ottomanelli's principals believe the past due balance had been paid, and upon information and belief, that Defendants retained for themselves significant sums of money that were otherwise due to Ottomanelli.

26.     Subsequent attempts by Ottomanelli to audit the books and get a sense of the true nature of the accounting were rebuffed by Defendants.

27.     Upon information and belief, Defendants had been, and were continuing to substantially overcharge Ottomanelli for the products being supplied.

28.     Moreover, Defendants had unilaterally refused to honor the volume discount and cost savings agreements which had been negotiated with Ottomanelli, and which were repeatedly confirmed.

29.     Because Ottomanelli had based its wholesale prices on these negotiated prices, Ottomanelli's profits were compromised and its business was further impaired.

30.     In October 2009, Defendants claimed that outstanding invoices totaled in excess of $150,000, sought the immediate payment of this amount in full, and again threatened to withhold shipments in violation of the Supply Agreement if their demand was not met.

31.     Ottomanelli again relented, and agreed to pay the $150,000 that Defendants alleged they were owed.

6

32.     However, Ottomanelli was concerned that the extortion and threats of non-compliance with the terms of the Supply Agreement would continue unabated.

33.     To ensure that Defendants fully intended to comply with, *inter alia,* the supply and non-compete provisions of the Supply Agreement, on October 19, 2009 Zarko Grgas, president of Great American, drafted and signed a letter agreement which provided that, "Great American Lamb & Veal agreed to manufacture all the gourmet products, turkey burgers and kabobs for the past, present and future customer's of F. Ottomanelli Gourmet Foods, Inc. as per original Supply Agreement, December 7, 2007."

34.     Based upon this written assurance, Ottomanelli paid the $150,000 to Great American.

35.     However, on the very next order after the $150,000 was paid, Defndants again refused to deliver product  unless Ottomanelli paid for the goods on a cash on delivery ("COD") basis, rather than the net 21 days that was set forth in the Supply Agreement.

36.     Upon review and payment of the invoices on a COD basis, Ottomanelli recognized that Defendants had also drastically and unilaterally increased the price they were charging Ottomanelli for the products.

37.     When Ottomanelli was financially unable to pay on a COD basis, Defendants stopped shipping, in direct breach of their re-confirmed contractual obligation.

38.     Shortly thereafter, a representative of Great American contacted Shop & Stop and indicated that Ottomanelli was experiencing dire financial circumstances, and would likely be unable to fulfill the requirements of the orders going forward.

39.     In addition, in direct contravention of the express terms of the Supply Agreement,

7

the individual further indicated that Defendants had the ability and inclination to continue the

relationship with Stop & Shop without Ottomanelli.

40.     During that same call, the Defendant's representative indicated that Great

American could continue to use the Ottomanelli name and packaging.

41.     Thereafter, Defendants advised Ottomanelli that Great American would not

deliver product to Ottomanelli's customers unless Ottomanelli paid for this and all future orders

on a cash before delivery ("CBD") basis.

42.     On the most recent invoices prepared in late November 2009, Defendants stopped

reflecting its actual cost, as agreed, and simply billed Ottomanelli at the same price that

Ottomanelli was billing Stop & Shop.

43.     Recently, Defendants, who were unequivocally prohibited by the Supply

Agreement from contacting any of Ottomanelli's customers, sent Stop & Shop a document

allegedly listing open Ottomanelli invoices, and demanding payment of those invoices by Stop &

Shop.

44.     The Defendants had no basis to seek payment from Stop & Shop under any

circumstances, and the contact itself was a direct breach of the Supply Agreement.

45.     In addition, Defendants' allegations of unpaid invoices were false, as the

enumerated invoices had been paid by Ottomanelli.

## AS AND FOR A FIRST
## CLAIM FOR RELIEF
(Breach of Contract)

46.     Plaintiff repeats and realleges the allegations contained in Paragraphs "1" through "45" hereof as if more fully set forth herein.

47.     Pursuant to the Supply Agreement, Defendants were obligated to supply Ottomanelli with all of the product it required.

48.     Pursuant to the Supply Agreement, Defendants were not permitted to sell to or even contact Ottomanelli's customers.

49.     In breach of the Supply Agreement, Defendants refused to supply products to Ottomanelli's customers unless Ottomanelli complied with pre-conditions not required under the Supply Agreement.

50.     In breach of the Supply Agreement, Defendants have contacted Ottomanelli's customers, and have undertaken efforts to sell to Ottomanelli's customers.

51.     By reason of the foregoing breaches of the Supply Agreement, Ottomanelli has suffered damages in an amount to be determined at the trial of this action, but believed to be in excess of $500,000, plus interest.


## AS AND FOR A SECOND
## CLAIM FOR RELIEF
(Breach of Contract)

52.     Plaintiff repeats and realleges the allegations contained in Paragraphs "1" through "51" hereof as if more fully set forth herein.

53.     Pursuant to the agreement between the parties, Defendants agreed to bill

9

Ottomanelli for its cost pursuant to an agreed formula, and provide certain volume and cost discounts.

54.     Pursuant to the agreement between the parties, as modified, Defendants were for a period of time also required to properly collect and apply receivables from Ottomanelli's customers, and to account to Ottomanelli for such transactions.

55.     In breach of the agreements, Defendants over-charged Ottomanelli and, upon information and belief, failed to apply collections to the purported indebtedness of Ottomanelli and failed to keep proper accounting records.

56.     By reason of the foregoing breaches, Ottomanelli has suffered damages in an amount to be determined at the trial of this action, but believed to be in excess of $350,000, plus interest.

### AS AND FOR A THIRD
### CLAIM FOR RELIEF
(Tortious Interference with Contract)

57.     Plaintiff repeats and realleges the allegations contained in Paragraphs "1" through "56" hereof as if more fully set forth herein.

58.     Ottomanelli had a pre-existing contractual relationship with Stop & Shop and Defendants were well aware of this contractual relationship.

59.     Defendants contacted Stop & Shop and made several malicious, fraudulent and deceitful comments regarding Ottomanelli, including statements claiming Ottomanelli was in financial distress and likely unable to deliver future orders, without any legitimate business purpose.

10

60.     Ottomanelli's standing and contractual relationship with its customers has been impaired because of this tortious conduct.

61.     As a result of the foregoing, Ottomanelli has been damaged in an amount to be determined at trial, but believed to be in excess of $500,000.00, plus interest.

62.     Defendants engaged in such conduct with a conscious, deliberate and intentional and/or reckless disregard of the rights of Ottomanelli; as such, Ottomanelli is also entitled to an award of punitive damages to deter future misconduct by Defendants and others in amount to be determined at trial.

### AS AND FOR A FOURTH
### CLAIM FOR RELIEF
(Defamation and Libel)

63.     Plaintiff repeats and realleges the allegations contained in Paragraphs "1" through "62" hereof as if more fully set forth herein.

64.     In the course of its improper communications with Stop & Shop, Defendants questioned Ottomanelli's business practices and ethical behavior, stated that Ottomanelli was in significant financial trouble and would therefore be unlikely to fulfill the requirements of future orders, sent documents which purported to reflect amounts due Great American and threatened Stop & Shop with legal action to collect the indebtedness.

65.     These factual statements and the information contained in the documents were inaccurate and untrue, were known by Defendants to be so at the time of their publication, and constitute libel and/or defamation *per se.*

66.     By reason of the foregoing, Ottomanelli has been damaged in an amount to be

determined at trial, but believed to be in excess of $500,000.00, plus interest.

67.   Defendants engaged in such conduct with a conscious, deliberate and intentional and/or reckless disregard of the rights of Ottomanelli; as such, Ottomanelli is also entitled to an award of punitive damages to deter future misconduct by Defendants and others in amount to be determined at trial.

### AS AND FOR A FIFTH
### CLAIM FOR RELIEF
(Accounting)

68.   Plaintiff repeats and realleges the allegations contained in Paragraphs "1" through "67" above as if fully set forth herein.

69.   Based upon the foregoing, Plaintiff is entitled to an accounting from Defendants of all monies received by Defendants from Plaintiff and its customers.

70.   Based upon the foregoing, Plaintiff is entitled to an accounting from Defendants of their actual cost in obtaining the meat and poultry under the Supply Agreement.

**WHEREFORE**, plaintiff F. Ottomanelli Gourmet Foods, Inc. respectfully demands judgment in its favor against Dorzar, Inc. and Great American Veal, Inc. as follows:

(a)   On its first claim, in an amount to be determined at trial, but believed to be in excess of $500,000.00, plus interest;

(b)   On its second claim, in an amount to be determined at trial, but believed to be in excess of $350,000.00, plus interest;

(c)   On its third claim, in an amount to be determined at trial, but believed to be in excess of $500,000.00, plus interest, together with an award of punitive damages;

12

(d)     On its fourth claim, in an amount to be determined at trial, but believed to be in excess of $500,000.00, plus interest, together with an award of punitive damages; and

(e)     On its fifth claim, an order requiring Defendants to account for all monies received by Plaintiff and its customers and their actual cost in obtaining the meat and poultry pursuant to the Supply Agreement;

(f)     Together with such other, further and different relief as this Court may deem fair and just.

**JURY DEMAND**

Plaintiff demands a trial by jury on all issues.

Dated:     New York, New York
             November 30, 2009

PRYOR CASHMAN LLP

By: _____
     Michael G. Goldberg
     Mark A. Tamoshunas

     Attorneys for Plaintiff
       F. Ottomanelli Gourmet Foods, Inc.